```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND


EANGRIA BOUTHNER              *
                              *
v.                            *    Civil Action No. WMN-13-2287
                              *
GOOD SAMARITAN HOSPITAL OF    *
MARYLAND, INC.                *
                              *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM**

Before the Court is a Motion to Dismiss, or, in the Alternative, for Summary Judgment filed by Defendant Good Samaritan Hospital of Maryland, Inc. (GSH), ECF No. 7. Plaintiff opposed the motion, and Defendant replied. Upon review of the filings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion must be granted.

**I. FACTUAL BACKGROUND**

Plaintiff Eangria Bouthner, proceeding pro se, brought this action against her former employer, GSH, pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, et seq, and the Age Discrimination in Employment Act of 1967, as amended (ADEA), 29 U.S.C. §§ 621, et seq. Plaintiff is an African American woman, born in 1958, and alleges in her Complaint that GSH discriminated against her on the basis of her race, color, sex, and age. Plaintiff also alleges that she was

retaliated against for lodging a complaint against one of her supervisors, Kenneth Benson.  The relevant facts as alleged in the Complaint and in various materials submitted by Plaintiff with the Complaint are as follows.

Plaintiff began her employment with GSH in 1999 as a Telephone Service Representative.  She was promoted to a supervisor position and, in or around 2006, was promoted to the position of Manager of Switchboard Communications.  When promoted to that position, Plaintiff's direct supervisor was Kenneth Benson, GSH's Chief of Security.  While Plaintiff's relationship with Benson appears, initially, to have been positive, it began to degenerate at some point in 2008.  In a memorandum dated November 4, 2008, to Karen Evelius, an attorney in GSH's Human Resources Department, Plaintiff complained about how Benson was treating her and asking to be placed under a different supervisor.  Pl.'s Ex. B.

Plaintiff was eventually transferred to the supervision of April Lejsiak, GSH's Director of Imaging, on or about February 5, 2010.  ECF No. 1-1 at 6.  In another memorandum to Evelius dated February 21, 2010,[1] Plaintiff detailed the continuing

---

[1] The precise sequence of events and the correct dates for some of the documents are not entirely clear.  Plaintiff suggests that each time a document is opened in Word, the date is changed.  ECF No. 1-1 at 14 (handwritten note on February 21, 2010, Memorandum).  The Court notes that this memorandum also

2

tensions between her and Benson.  Id. at 14-17.  In her Complaint, Plaintiff also relates difficulties she experienced after she was transferred under the supervision of Lejsiak, including: being "yelled at on a daily basis;" being made to clock in and out for lunch; having her schedule micromanaged; and, being assigned numerous time consuming reports.  See ECF No. 1-1 at 6-8.  Plaintiff again complained to Human Resources and, on or about April 21, 2010, she was placed under the supervision of Thomas Senker, a GSH Vice President.[2]

Plaintiff alleges that her working conditions under Senker were no better.  She avers he "did everything in his power" to force her to resign and she "felt like a ball and chain was around [her] neck."  Id. at 10.  Specifically, Plaintiff

---

references, in the past tense, something that was alleged to have occurred many months after this memorandum was sent. Id. ("My corrected ADS was signed off on November 15, 2010. Since that date Ken Benson has attacked me in every way he can."). This would appear to simply be a typographic error.

[2] The chronology is further confused by Defendant's representation in its motion that Plaintiff's February 21, 2010, internal complaint about Benson "was resolved to Bouthner's satisfaction on April 21, 2010, when she was voluntarily and temporarily transferred to the supervision of another director, April Lejsiak."  ECF No. 7-1 at 2.  According to Plaintiff's Complaint and her later filed Charge of Discrimination, the April 21, 2010, transfer placed her under Senker, not Lejsiak. See ECF No. 1-1 at 9; ECF No. 7-2 at 1.

The Court finds that these minor chronological discrepancies are not material to the merits of Plaintiff's claims or GSH's defenses.

contends that Senker froze her department's budget, removed her from a Leadership message list, and added 18-20 more items to her job description.[3]  Id.  In June of 2010, Plaintiff was placed on administrative leave pending the investigation of a suspected payroll fraud issue.  Id. at 26.  She then applied for leave under the Family Medical Leave Act and was granted leave through August 31, 2010.  See id. at 66.  On or about August 9, 2010, Plaintiff sent a letter to Senker stating that she was resigning, effective August 23, 2010.

On or about December 13, 2010, Plaintiff filed a Charge of Discrimination with the Maryland Commission on Human Rights. ECF No. 7-2.  In that Charge, she recounted the difficulties she experienced under the supervision of Benson, Lejsiak, and Senker and concluded that she believed that she had been "discriminated and retaliated against because of [her] race (black)."  Id.  In that Charge, the boxes for "Race" and "Retaliation" were checked to indicate the bases on which she believed she was discriminated, but the boxes for "Color," "Sex," and "Age" were not checked.  Id.  Plaintiff was issued a "right-to-sue" letter on May 9, 2013, and timely filed this action.

---

[3] As Defendant observes, a comparison between her original job description and the job description put in place while she was supervised by Senker would indicate that her duties were essentially the same under both.  Compare ECF No. 1-1 at 43-44 with id. at 45-46.  The later description simply provided more specific detail.

4

In response to Plaintiff's Complaint, Defendant GSH filed a motion seeking dismissal or the entry of judgment on the following grounds: (1) because her charge of discrimination was limited to race and retaliation, Plaintiff failed to exhaust her administrative remedies as to any claim for color, sex, or age discrimination; (2) because she voluntarily resigned and cannot establish that this resignation was a constructive discharge, Plaintiff cannot establish that she suffered an adverse employment action; (3) Plaintiff's allegations are insufficient to establish a prima facie case of race discrimination; and (4) because she has not identified a protected activity in which she engaged, Plaintiff cannot establish a retaliation claim. While Plaintiff filed an opposition to this motion, for the most part, she fails to directly respond to any of these arguments but simply repeats, verbatim, the allegations in her Complaint.

## II. LEGAL STANDARD

Defendant's first argument must be analyzed under Fed. R. Civ. P. 12(b)(1), in that a Title VII plaintiff's failure to exhaust administrative remedies deprives the federal court of subject matter jurisdiction over such claims. <u>Jones v. Calvert Group, Ltd.</u>, 551 F.3d 297, 300–01 & n. 2 (4th Cir. 2009). Generally, "questions of subject matter jurisdiction must be decided 'first, because they concern the court's very power to

hear the case.'" Owens—Illinois, Inc. v. Meade, 186 F.3d 435, 442 n. 4 (4th Cir. 1999) (quoting 2 James Wm. Moore et al., Moore's Federal Practice § 12.30[1] (3d ed. 1998)). The plaintiff always bears the burden of demonstrating that subject matter jurisdiction properly exists in federal court. See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 647 (4th Cir. 1999). Dismissal for lack of subject matter jurisdiction is appropriate "only if the material jurisdictional facts are not in dispute" and the defendant is "entitled to prevail as a matter of law." Id. In its analysis, the court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Evans, 166 F.3d at 647.

Defendant's remaining arguments are governed by Fed. R. Civ. P. 12(b)(6).[4] The purpose of a motion to dismiss under this rule is to test the sufficiency of the complaint. Presley v. City of Charlottesville, 464 F.3d 480, 483 (4th Cir. 2006). At this stage, all well-pleaded allegations in a complaint must be considered as true, Albright v. Oliver, 510 U.S. 266, 268

---

[4] Although Defendant moved in the alternative for summary judgment and both sides submitted some additional materials outside of the Complaint, the Court finds that it can resolve the motion on the basis of the allegations in the Complaint and those documents attached to or referenced in the Complaint without converting the motion to one for summary judgment.

6

(1994), and all factual allegations must be construed in the light most favorable to the plaintiff. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 (4th Cir. 1999). In evaluating the complaint, however, unsupported legal allegations need not be accepted. Revene v. Charles Cnty. Comm'rs, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); see also Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009). Ultimately, a complaint must "'permit[] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (quoting Iqbal, 556 U.S. at 679). To this end, "while a plaintiff [in an employment discrimination case] is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, [f]actual allegations must be enough to raise a right to relief above the speculative level." Id. (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510–15 (2002); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

**III. DISCUSSION**

   **A. Exhaustion of Remedies**

Title VII requires a plaintiff to file a charge of discrimination with the EEOC prior to filing suit in federal court. Jones, 551 F.3d at 300-01. Furthermore, the scope of the civil action is confined to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation [of that complaint]." Id. Case law in the Fourth Circuit "make[s] clear that the factual allegations made in formal litigation must correspond to those set forth in the administrative charge. For example, the plaintiff's claim generally will be barred if his charge alleges discrimination on one basis – such as race – and he introduces another basis in formal litigation – such as sex." Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005).

Here, Plaintiff has attempted to do just that. Not only are the boxes for color, sex, and age not checked, the narrative in Plaintiff's Charge gives no hint that these were the purported bases for the alleged discrimination. The narrative makes no mention of Plaintiff's age or the age of any other employee. As to sex, Plaintiff not only names four women as comparators in her Charge but attests that, "all the whites

[whether] male or female were treated better th[a]n me." ECF No. 7-2 at 2.  As to "color," while Plaintiff describes herself as "black" and her better-treated comparators as "white," she is clearly using those terms to identify race, not color.  Thus, Plaintiff has only exhausted her administrative remedies as to her race and retaliation claims and her claims of sex, age, and color discrimination claims must be dismissed for lack of subject matter jurisdiction.

### B. Plaintiff's Race and Retaliation Claims

Throughout her Complaint, Plaintiff details the physical and emotional toll that resulted from Benson's, Lejsiak's, and Senker's treatment of her.  She asserts that this treatment was so objectionable that she was forced to resign, i.e., that she was constructively discharged.  She also repeats throughout her submitted materials that she is an African American woman.  To establish her claim of racial discrimination under Title VII, however, Plaintiff must do more than establish that she is an African American and that she was constructively discharged; she must establish that she was constructively discharged because she is an African American.  See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) ("The 'factual inquiry' in a Title VII case is whether the defendant intentionally discriminated against the plaintiff.  In other

9

words, is the employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (internal quotations omitted, emphasis added).

The Court will assume, without deciding, that Plaintiff could establish that she was "constructively discharged," i.e., that her working conditions were so objectively intolerable that they would have compelled a reasonable person to resign.[5] See Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1989). The Court concludes, however, that there are no factual allegations in her Complaint that would support the conclusion that she was treated differently because of her race. In fact, as explained

---

[5] It is, however, doubtful that Plaintiff could establish that she was constructively discharged. The Fourth Circuit has held that, because of the potential for abuse, claims of constructive discharge must be "carefully cabined," Paroline v. Unisys Corp., 879 F.2d 100, 114 (4th Cir. 1989), and that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 (4th Cir. 2004); see also Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (holding that a plaintiff's allegations that "her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back . . ., even if true, do not establish the objectively intolerable working conditions necessary to prove a constructive discharge").

below, Plaintiff's allegations clearly point to very different motivations on the part of her three supervisors.

The Court notes that, at least initially, Benson consistently praised Plaintiff's work.  With her Complaint, she attaches her Performance Assessment completed by Benson for the period of April 2007 through March 2008 in which he has nothing but positive things to say about Plaintiff and concludes that Plaintiff "sets high standards for herself and lives up to them."  ECF No. 1-1 at 21.  Plaintiff also attaches her employee evaluation, completed by Benson in May of 2008, in which he rated her exceptionally high in every single category.  Id. at 19.  In November of 2008, Benson authored a memorandum in support of upgrading a position in Plaintiff's department that repeats his exceptionally positive assessment of Plaintiff's work.  Id. at 20.  This degree of praise from Benson is completely inconsistent with the suggestion that he harbored any racial animosity toward Plaintiff.

Plaintiff does allege that there was an abrupt change in Benson's attitude towards her at some point between 2008 and 2010.  She suggests that Benson's purchase of an expensive house, the economic downturn and the hospital's desire to cut costs, and Benson's awareness that Plaintiff's department was well run and that she had previous security experience, all

combined to lead Benson to try to "set [her] up, so that [she] would not be in the picture, if it came down to his job, or [hers]."  Id. at 5.  She also avers that her sending the November 4, 2008, memorandum to Human Resources complaining about Benson's failure to communicate with her and asking to be transferred to a more responsive supervisor, "got the fire started" and that Benson "never got over the fact that I wanted out of his Leadership."  Id. at 47-48.  Throughout the materials she submitted to the Court, Plaintiff repeats the assertion that Lejsiak and Senker treated her in the way that they did because they were "buddies" or "great friends" of Benson.  Id. at 6, 8, 11.

Thus, from the allegations in the Complaint, one could conclude that Benson, later aided by Lejsiak and Senker, sought to retaliate against Plaintiff for lodging complaints about Benson with the Human Resources Department.  To establish a retaliation claim under Title VII, however, one of the elements that a plaintiff would need to establish is that she first "engaged in a protected activity" which led to the retaliation. Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).[6]  In this context, to be considered "protected activity,"

---

[6] The remaining two elements that must be shown to establish a retaliation claim are: that an adverse action was taken against

12

the complaints that generated the retaliatory response must have been complaints about conduct that is itself prohibited under Title VII. See <u>Harris v. Maryland House of Corrections</u>, 209 F. Supp. 2d 565, 570 (D. Md. 2002) (holding that plaintiff could not bring retaliation claim where, in the filed charge for which she claimed she was retaliated, "plaintiff merely complained of the unfair manner in which her supervisors had treated her"); <u>Oguezuonu v. Genesis Health Ventures, Inc.</u>, 415 F. Supp. 2d 577, 588 (D. Md. 2005) (holding that plaintiff's raising of general complaints about the way she was treated, with no reference to race or national origin discrimination, was not protected activity); <u>Smith v. Virginia Dept. of Agric. & Consumer Servs.</u>, Civ. No. 12-77, 2012 WL 2401749 (E.D. Va. June 25, 2012) (holding the plaintiff did not engage in protected activity where she raised concerns to human resources regarding the way she was treated but "nothing indicated she voiced concerns about employment practices made unlawful by Title VII").

Here, Plaintiff's complaints about Benson to the Human Resources Department mention nothing about race or racial discrimination. The November 4, 2008, "formal complaint" sets out in considerable detail her opinions regarding Benson's failure to respond to her inquiries, his explosive temper, and

---

her; and, that there was a causal connection between the protected activity and the adverse action. <u>Id.</u>

13

his unfair criticism of her work product. Nowhere in that memorandum, however, does she aver that this treatment was based on race or any other class-based discrimination.[7] In her February 21, 2010, memorandum, Plaintiff alleges similar vindictive behavior on the part of Benson and attributes it to Benson's desire to get her back, "[n]ot just for going to [Human Resources] but now, for going to [Senker]." ECF No. 1-1 at 16.[8] Again, there is nothing alleging that this treatment was tied to any racial animus.

The Court finds that the allegations in the Complaint could support the conclusion that Plaintiff was a good and dedicated worker and that she was treated badly by a succession of

---

[7] The lack of any reference to race in this memorandum is actually highlighted by Plaintiff in the manner in which she submitted this document to the Court. In this memorandum, she alleges that Benson poked fun at the employees that worked in her department, calling them "stupid . . . morons." In the margin of the copy of this memorandum submitted with her opposition, Plaintiff handwrote next to this statement, "most are all African Americans." Pl.'s Ex. B at 2. There is no indication that this annotation was part of the memorandum when it was submitted to Evelius in the Human Resources Department, and thus, no reason for anyone to conclude that Plaintiff was attempting to lodge a complaint about discrimination.

[8] In this memorandum, Plaintiff does inject a comment related to gender. After describing her discovery of something Benson had done to sabotage her, she remarks, "I could only think and say to myself, does this man think because I am a WOMAN I am stupid?" ECF No. 1-1 at 16. This single reference to gender, however, does not transform the memorandum into a complaint of sex discrimination in light of the overall tenor of her complaint, i.e., that Benson was out to get her for complaining to Human Resources about his management style.

supervisors.  The allegations could also support the conclusion that, when Plaintiff complained about the poor supervision she was given, Benson and his friends retaliated against her and treated her even more harshly for the purpose of driving her out of her position.  If accepted as true, the allegations could lead one to conclude that Plaintiff was treated unfairly and that the hospital lost a valuable employee.  While egregious, if true, Title VII simply does not protect against every inequity in the workplace, only those made unlawful under the statute.

Accordingly, the Complaint will be dismissed.  A separate order consistent with this Memorandum will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

Dated:  April 28, 2014